Douglas K. **KNUTSON** et al.,
Plaintiffs,

v.

The **DAILY REVIEW, INC.,** a corporation, et al., Defendants.

No. C-73-1354-CBR.

United States District Court,
N. D. California.

Sept. 22, 1975.

G. Joseph Bertain, Jr., Timothy H. Fine, Thomas Amen, San Francisco, Cal., for plaintiffs.

Broad, Khourie & Schulz, Michael N. Khourie, Thomas Paine, San Francisco, Cal., for defendants.

MEMORANDUM OF OPINION

RENFREW, District Judge.

After an extensive trial, this Court issued its Memorandum of Opinion and Final Judgment and Order in the above-noted case on September 23, 1974. The Court found that despite defendants' violation of the antitrust laws, plaintiffs, independent newspaper dealers for *The Argus* and *The Daily Review,* failed to establish their damage claims. In the exercise of its equitable powers, the Court ordered at that time certain offers of employment by defendants made to plaintiffs prior to trial and continued during trial by a stipulated injunction be continued for a stated period of time. This was done in order to permit each plaintiff, who so desired, to obtain employment as a district manager unless good cause could be shown by the defendant newspaper for withdrawing the offer. The question whether good cause was shown was to be subject to arbitration with an arbitrator chosen by mutual agreement of the parties. Thereafter, certain plaintiffs accepted employment as district managers and others were refused employment, raising the issue whether good cause was shown for the refusal. The matter was submitted to the arbitrator after extensive testimony, briefing and argument. Pending the results of the arbitration, the Court

ordered that those plaintiffs be continued in their status as independent dealers.

Thereafter, in a series of motions and orders to show cause, various issues involving the relationship of the parties were presented to the Court. First was the comparabilities of vacations offered to former independent dealers who became employee district managers prior to the trial with vacations offered to plaintiffs who accepted employment after the trial. Then a question arose as to the destruction of newspaper racks used in connection with street sales of the newspapers involved and the tensions that arose at the printing plant between plaintiffs and employees of defendants. Finally, the matter of the termination of certain of the independent dealers and the discharge of certain employees was heard by the Court. Because the Court had been assigned to hear an extended criminal case out of California, and because of the Court's concern that the parties be heard as soon as possible on these very important matters, the most recent hearings were conducted on Friday afternoon and evening, June 13, 1975; Saturday, June 14th; Saturday, June 28th; and Sunday June 29th. At the Sunday session the Court orally modified its Final Judgment and Order deleting paragraph 7 requiring that all plaintiffs be offered employment as district managers in the absence of a showing of good cause. A written order to this effect was signed and filed on July 8, 1975. This Memorandum of Opinion was prepared shortly thereafter but not released at the request of counsel for plaintiffs who, after obtaining a copy of the reporter's transcript of the most recent hearings, submitted certain proposed findings of fact and conclusions of law which the Court has reviewed and now rejects.

When the initial offer was entered requiring defendants to continue in effect the offers of employment, the Court's decision was based upon a careful weighing of all the facts and circumstances known at that time. *See Burton v. Cascade School District Union High School No. 5,* 512 F.2d 850 (9th Cir. 1975). The Court's decision was based upon two fundamental, albeit unstated, premises. The first was that the temporary maintenance of a dual distribution system pending the results of arbitration would not threaten the continued economic viability of the newspapers. At that time the Court had before it the financial records of defendant *The Daily Review* as of the spring of 1974. The second was that plaintiffs would conduct themselves in good faith, not merely restrict their activities to the permissible bounds of their legal rights.

The Court has now reviewed financial statements of *The Daily Review* for the first four months of 1975. Those financial statements indicated losses in excess of $300,000 which, if continued, threaten the very existence of the newspaper. While defendant *The Argus* showed profits, the profits were nowhere near sufficient to offset the losses of *The Daily Review.* Another alarming statistic was that the circulation of *The Daily Review* fell dramatically from approximately 44,000 in 1973, immediately prior to the filing of this lawsuit, to approximately 38,000 as of the date of the last hearing, a decline of nearly 15%. A further factor not present at the time the earlier order was issued is the hostile tension at *The Daily Review.* The Court had originally hoped that the matter of employment of plaintiffs as district managers could be resolved, including, arbitration, within several months. However, as time went on, tensions increased at *The Daily Review* culminating in events in late May and June involving the destruction of many street racks and exchanges of threats of bodily harm necessitating on occasion the calling of the police to the printing plant of *The Daily Review.* Without attempting to assign fault, it is apparent that the working environment of *The Daily Review* is one which threatens the continued viability of that newspaper, particularly in light of its financial losses and declining circulation. Since the Court's earlier order, the competition in the East

Bay appears to have increased. *The Oakland Tribune* has engaged in a most aggressive competition with the defendant newspapers and is vigorously attempting to penetrate further *The Daily Review* market area.

In the exercise of its equitable powers, the Court cannot ignore the interest of the other employees of *The Daily Review* and of the public which the paper serves in having an independent editorial and news view.

Without attributing bad faith to plaintiffs, certain circumstances do appear to raise questions as to their conduct during the time involved. While the statistics may be said to be incomplete and, as argued by plaintiffs, deceptive, there is evidence that plaintiff independent dealers have not performed as well as employee district managers in three areas. The average circulation loss of plaintiff *Daily Review* dealers is greater than that of employee district managers for that paper; plaintiffs have not made adequate efforts to generate new circulation, either by their own efforts or those of their carriers; and to suit their own convenience they have failed to turn in carrier-generated start orders in all cases. Further, plaintiffs by their conduct, while within their legal rights and not proscribed by an order of the Court, did not in all situations act in good faith while the disputes were being arbitrated. Several plaintiffs had fulltime independent jobs. It was never the Court's intention to freeze existing districts or dealerships, but rather merely to offer employment to individual plaintiffs. Certain of the plaintiffs engaged in extensive street sales placing their street racks immediately next to those operated by *The Daily Review*. They sold newspapers at street sale at prices below those suggested by the publisher where they competed with the publisher, but in the areas in which they furnished home delivery service and where there was no competition sold (through their carriers) at prices substantially above those suggested by the publisher. While none of these were unlawful or contrary to court order, they did contribute to the problems experienced by the newspaper.

Another consideration which the Court could not ignore was the significant role that plaintiffs' counsel played in the entire proceeding. Pursuant to his written instructions plaintiffs took notes of statements made by the circulation manager during meetings which they reported back to their counsel. They would refer matters back to counsel before carrying out certain orders of the circulation manager. In other instances directions came directly from counsel rather than the circulation manager. These instructions were not as significant because of their substance but because they were of a nature which should have come from the circulation manager. The Court does not mean to suggest that counsel acted in any way in bad faith, but the fact that many of his clients, in effect, took their orders from him rather than from their superiors at the newspaper contributed to the problems before the Court.

The Court found that defendants did not act in bad faith in connection with the terminations and discharges. Not all of the plaintiffs were terminated and some non-plaintiff employees had been discharged. These facts collaborate defendants' contentions that the terminations and discharges were for legitimate business reasons and not because of participation in the lawsuit.

Based upon these considerations and the radical change in circumstances, the Court vacated that portion of its previous order which precluded the termination of any plaintiff pending the result of arbitration. In these altered circumstances it was no longer necessary to continue with the arbitration or wait for its results. The Court did not reach its decision without a great deal of thought being given to the balancing of the interests of the parties. The Court was greatly concerned about the impact of its order upon the plaintiffs involved. However, because of the broader interests involved and the precarious position

of *The Daily Review,* it saw no course other than that taken here. Because of this concern the Court did direct that defendants pay to those terminated independent dealers and discharged employees six weeks' pay to assist them during the period following their severance of relations with the paper.

It was for the foregoing reasons that the Court issued its oral order of June 29, 1975, modifying its Final Judgment and Order in this matter as set forth herein.